# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**JULIUS WEBSTER,**

       Petitioner,

       v.

**WARDEN SHELBIE SMITH,**

       Respondent.

Case No. 1:17 CV 2519

Judge Jeffrey J. Helmick

Magistrate Judge James R. Knepp II

**REPORT AND RECOMMENDATION**

## INTRODUCTION

Petitioner Julius Webster ("Petitioner"), a prisoner in state custody, filed a Petition seeking a writ of habeas corpus under 28 U.S.C. § 2254 ("Petition"). (Doc. 1). Respondent Warden Shelbie Smith ("Respondent") filed an Answer (Doc. 5), Petitioner filed a Reply (Doc. 10), and Respondent filed a Sur-reply (Doc. 11).[1] The district court has jurisdiction over the Petition under § 2254(a). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(2). (Non-document entry dated May 11, 2018). For the reasons discussed below, the undersigned recommends the Petition be denied in its entirety.

## FACTUAL BACKGROUND

For the purposes of habeas corpus review of state court decisions, findings of fact made by a state court are presumed correct and can only be contravened if the habeas petitioner shows, by clear and convincing evidence, erroneous factual findings by the state court. 28 U.S.C. §

---

1. Parties and Courts commonly use the terms "Return of Writ" and "Traverse" to refer to what the Rules Governing Section 2254 Cases now term an "Answer" and "Reply". *See* Rule 5 of the Rules Governing Section 2254 Cases.

2254(e)(1); *Moore v. Mitchell*, 708 F.3d 760, 775 (6th Cir. 2013); *Mitzel v. Tate*, 267 F.3d 524, 530 (6th Cir. 2001). This presumption of correctness applies to factual findings made by a state court of appeals based on the state trial court record. *Mitzel*, 267 F.3d at 530. The Ohio Eighth District Court of Appeals set forth the following facts on direct appeal:

> {¶ 3} In May 2014, Webster was charged with several violent offenses in a 23–count indictment. The indictment was comprised of four separate incidents under an umbrella theory that Webster committed each offense in furtherance of his criminal gang, the Heartless Felons.

> {¶ 4} Count 1 alleged that Webster participated in a criminal gang with codefendants Robert Porter, Dawayne Arnold, Derrick Durden, and Lakia Golston, in violation of R.C. 2923.42(A), from June 17, 2013 to December 6, 2013. Webster was also charged with aggravated murder, murder, multiple counts of aggravated robbery, having a weapon while under disability, felonious assault, tampering with evidence, escape, obstructing justice, retaliation, and intimidation of a crime victim or witness. Many charges included firearm, repeat violent offender, and gang activity specifications.

> {¶ 5} Webster filed pretrial motions, including a motion to suppress evidence, a motion to sever counts in the indictment, and a motion in limine. In the motion to suppress, Webster sought to exclude evidence of an eyewitness' identification of Webster in a photo lineup. In the motion to sever counts, Webster argued many [of] the counts were unrelated to one another, and that joinder of unrelated criminal offenses was unfairly prejudicial.

> {¶ 6} In the motion in limine, Webster sought to prevent the state from arguing and presenting evidence of his involvement in the Heartless Felons. Webster asserted that, in the event the court overruled his motion to sever counts, he would bifurcate all gang-related activity counts and specifications, as well as the having weapons while under disability offenses, and try them to the court. Webster sought to preclude the jury from hearing any evidence that would suggest he was a member of a gang.

> {¶ 7} The trial court denied Webster's motion for severance, and partially granted his motion in limine. In the journal entry denying Webster's motion to sever counts, the court stated:

>> Defendant's motion for severance is denied. * * * Following review and a hearing, the court has determined that the offenses are properly joined in this matter. The offenses share a commonality with regard to temporal proximity, were committed while the defendant was being sought on escape charges out of Cuyahoga County, and

2

arguably fall under the umbrella of being committed as part of gang activity as charged in the indictment. The court believes that this satisfies the "course of criminal conduct" factors stated in Crim.R. 8. As such, the motion is denied.

The court's journal entry on the motion in limine states, in relevant part:

> The state of Ohio will be permitted to make limited reference to the Heartless Felons organization as that information relates to relationships between various characters involved in the events involved in the instant matter and to show what it believes to be a motive for committing the crimes alleged in the indictment. The state may utilize whatever evidence it deems appropriate to do so but subject to review via objection by the Defendant during the course of the trial.

> The state will not be permitted to introduce evidence to a jury regarding the prior convictions of the defendant (unless Defendant chooses to testify) and other alleged members of the Heartless Felons, any expert testimony regarding the specifics of the organization or any other evidence specifically designated for purposes of proving the counts of the indictment that relate solely to gang participation. As above, this ruling is also subject to review and revision by the Court during the course of the trial.

Following the court's rulings, the cases proceeded to a jury trial where the following evidence was presented.

{¶ 8} On August 10, 2013, two men, armed with guns, robbed the B & B Mart located at 623 Cherry Street in Canton, Ohio. After the men left, Eric Brunner ("Brunner"), a store employee, gave police a description of the suspects and told them that one of the robbers went behind the counter, pushed him to the ground, and held a gun to his head. Brunner also told police that the second gunman fired a shot into the ceiling. The robbers collected cash, cigarettes, lighters, and other merchandise in trash bags.

{¶ 9} There was a video cassette recorder ("VCR") surveillance system in the store, and a VCR behind the cashier's counter. The robber behind the counter pulled the VCR out and attempted to remove the tape, but was unsuccessful. Consequently, he threw Brunner into the shelf, causing everything to fall on the ground. Patrolman Scott Jones ("Ptl.Jones") of the Canton Police Department, responded to the scene and later testified at trial that the appearance of the store was consistent with Brunner's description of the events.

{¶ 10} The surveillance camera captured the robbery on video, but the picture was not clear, and the men's faces were covered with bandanas. However, the robber

3

behind the counter was wearing a blue and white hat that caught the attention of Detective David Fitzgerald ("Det. Fitzgerald") of the Canton police department. Det. Fitzgerald testified that as part of his investigation, he compared clothing found near the vicinity of the store with clothing worn by the robbers in the video. Det. Fitzgerald surmised the robbers threw hats, bandanas, and other items away after the robbery to avoid detection. A blue and white hat found near the store matched the appearance of the hat worn by the person in the video, who attempted to remove the tape from the VCR.

{¶ 11} Investigators discovered one of Webster's fingerprints on the VCR. They also found a loaded nine-millimeter semiautomatic handgun lying behind a tire in the store's parking lot. DNA analysts tested swabs taken from the gun and live rounds. Webster's fingerprints were not found on these items. However, they found a "mixture" of DNA on the swab taken from the trigger of the gun that contained DNA with a "very distinct" profile of an unidentified man. Webster's DNA was found on the sweatband inside the blue and white hat and in a spot of blood on the outside of the hat. The store owner, Muhammed Ali, testified that Webster was a regular customer at the store.

{¶ 12} Thirteen days after the robbery at the B & B Mart, an individual named Rodtez Woody ("Woody") was robbed of his SUV at the Sunoco gas station located at the corner of East 110th Street and St. Clair Avenue. Woody testified that a man came up behind him and choked him while he was pumping gas. Another man held something in his back that Woody believed to be a gun. After the men drove off in the SUV, Woody called 911. Police responded to the scene and located the car later that same day. Police also dusted the vehicle for fingerprints and found Webster's fingerprints on the back window above the gas tank. Another fingerprint recovered from the other side of the car belonged to codefendant Dawayne Arnold. There was also evidence that Webster's cell phone was used at cell towers in the vicinity of the crime.

{¶ 13} Five days later, an individual named Curtis Marks, Jr. ("Marks") was shot and killed outside the Club Fly Hygh on Superior Avenue near East 71st Street. Marks's friend, Demetrius Thomas ("Thomas"), testified that in the early morning hours of August 29, 2013, he went to the Club Fly Hygh where he happened to meet Marks. At some point in time, Marks and Thomas left the bar and went across the street to smoke a cigar. Shortly thereafter, a man Thomas recognized as Robert Porter ("Porter"), a.k.a. "Pistol Pete," approached them with another man Thomas had never seen before. The man was later identified as Webster.

{¶ 14} Referring to Thomas, Porter told Webster, "there's Bobo's uncle right there." Webster asked Thomas if that was true, and Thomas confirmed that he was in fact the uncle of a man who goes by the nickname "Bobo." Following this brief exchange, Webster ordered Marks to "give it up," and warned "I'm going to count to three." Marks laughed and said he did not have anything. However, when Webster began counting, Marks told him his "stuff" was "in his drawers." Porter

4

removed items from Marks's pants and pockets. Although the men had Marks's belongings in their possession, Webster continued counting, and at the count of "three," he shot Marks in the side of his chest at point blank range. Neither Webster nor Porter robbed Thomas even though he had $4,700 on his person. After the shot, Webster and Porter walked toward East 71st Street. Porter's girlfriend, Myranette Bradford ("Bradford"), testified that she and Webster's girlfriend, Lakia Golston ("Golston"), drove Porter and Webster home at the end of the night.

{¶ 15} Later that morning, Thomas went to see Marks at MetroHealth Hospital and learned he had died. A few hours later, Thomas made a written statement to Cleveland police and identified Porter as being involved in the incident, but indicated Porter was not the shooter. Thomas told police the shooter was 5 feet 11 inches to 6 feet tall, with "real low, almost bald hair, a mustache and a little fuzz on his chin, wearing a burgundy hoodie." During his testimony, Thomas clarified that by "burgundy" he meant a shade of "red."

{¶ 16} Police showed Thomas a "six pack" photo array that did not include a picture of Webster. Thomas concluded that one of the individuals in the array "favor[ed] the shooter," but he was unable to identify the shooter in the lineup. When Thomas was later presented with a second photo array that included Webster, Thomas identified Webster as the shooter.

{¶ 17} Golston testified that she was with Webster at the Club Fly Hygh on the night of August 28, 2013, into the early morning hours of August 29, 2013. Golston often communicated with Webster through text messages and through their respective Instagram accounts. Golston's Instagram account name was "Queen Kiece," and Webster's was "Man of Loyalty." Golston identified several photographs that were taken on her cell phone or posted on Instagram. One photograph, identified as state's exhibit No. 151, depicted Webster and Porter and was taken on the night of Marks's murder. The picture shows Webster wearing a red hoodie.

{¶ 18} Golston also identified Webster's handwriting on several letters and envelopes. She testified that Webster sometimes used numeric codes when writing to her. One of the letters was addressed to her in an envelope in someone else's handwriting with the return address from someone named "Robert Marsh" in the Cuyahoga County jail. The letters inside the envelope were written in Webster's handwriting and contained the kind of coded messages Golston had seen Webster use in the past. Golston never received these letters because they were intercepted by officers in the jail.

{¶ 19} Sergeant Phillip Christopher ("Sgt.Christopher") of the Cuyahoga County Sheriff's Office also testified at trial. He was in charge of jail visitation, phone calls, and mail, and testified that, pursuant to a subpoena, all of Webster's non-attorney mail was monitored by officers in the jail. An officer with extensive knowledge in codes, cracked the numeric code Webster used in his letters and gave Sgt.

Christopher a cipher, which he used to decode Webster's letters. A letter previously identified by Golston, stated, in relevant part:

> Now listen, it's a few things I need you to handle. Call 'cuz D and ask him did he get that letter and did he do what I asked of him. If not, we got to get in contact with your son Webbie * * * and tell him he is on my indictment. * * * The poison ass n[——]a is Rodtez Woody. Your son supposed to know boy boy so no more need to be said.
>
> * * *
>
> Well, I am about to end this meeting of the minds. I love you * * *. Be careful what you write me and don't write back to the name on the lope. Write to me.

(Tr. 1890–1891.)

{¶ 20} Another letter read, in relevant part:

> O–Dog, what up young. How you holdin'. I hoping you moving in a manner of a G. The streets talkin' and they speaking bad upon your name like you about to do the unthinkable. I can't believe it so I will be at court to witness what's what. But other than that everybody good out there. We still movin as one. You know the team. We all mad that ya'll in there but we all will be back at it soon. As them people watching we can't risk puttin name and address on shit but just know the team rooting for ya'll. Stay up my n[——]a on your ten toes.
>
> Real n[——]a signing off.
>
> Below this language, the letter stated:
>
> My Queen, rewrite this and send it to O–Dog, Robert Porter. Fake name and address on the lope. Oh, yeah, send this other letter to Mitch, Malcolm Wilson, number 650–268.

{¶ 21} Sgt. Christopher further testified that Porter was in the county jail at the time this letter was confiscated and copied. Although Webster was in jail with Porter simultaneously, there was a separation order that prevented the two men from coming into contact with each other.

{¶ 22} Detective Ray Burant ("Det. Burant"), a member of the U.S. Marshal[] Violent Fugitive Task Force, along with another officer, arrested Webster and Golston in Parma, on October 23, 2013. While Det. Burant was sitting in the

passenger seat of the vehicle that transported Webster and Golston to the county jail, he overheard Webster tell Golston, "Don't worry, there won't be a trial because there won't be any witnesses." (Tr. 1835.) After Det. Burant told Webster to be quiet, Webster whispered to Golston, "[D]on't worry, aint nobody going to say anything." (Tr. 1835.)

{¶ 23} Det. Alfred Johnson ("Det. Johnson"), of the Cleveland Police Gang Impact Unit, testified before the jury in a limited fashion. He acquired knowledge of the Heartless Felons, including the identities of several of its members, from his various investigations, but did not discuss any specific details of those investigations in front of the jury. Det. Johnson explained that the Heartless Felons use certain terms when speaking to one another that have a meaning for them that a common person would not understand.

{¶ 24} Det. Johnson explained that the phrase "no more need be said" means either that an order has been executed or will be executed. Webster used this phrase in his letter to Golston that seemed to make reference to an order that was previously given to gang members to murder Rodtez Woody to prevent him from testifying at trial. The phrase "the unthinkable" means that someone is going to snitch. In the letter, Webster asked Golston to rewrite and send to Porter, Webster tells Porter he knows Porter is thinking of "doing the unthinkable." The phrase "shooting a movie" refers to either a shooting or a robbery.

{¶ 25} According to Det. Johnson, the Heartless Felons also have a strict code of conduct. One of their rules prohibits a member from "shooting a movie" against another member or the family of another member. Although Det. Johnson did not testify specifically about Thomas, the implication was that Porter and Webster did not rob Thomas because he was the uncle of another Heartless Felons member known as Bobo.

{¶ 26} The case was submitted to the jury at the end of the state's case. While the jury deliberated, the court heard evidence related to Webster's gang activity, his use of firearms while under disability, and the escape charge. Officer Tony Luketic ("Officer Luketic") of the Adult Parole Authority, testified that he supervises gang members on postrelease control. Officer Luketic became Webster's parole officer upon his release from prison in December 2012. At the time of trial, he was supervising between 30 and 40 members of the Heartless Felons. Officer Luketic testified that Webster stopped reporting to him in June 2013, and a warrant was issued for his arrest on June 17, 2013. Webster was not arrested until October 2013.

{¶ 27} Sgt. Christopher discussed some of Webster's other letters that were intercepted in the mail that openly discussed Webster's involvement in the Heartless Felons. In one letter addressed to an Ohio prison inmate named Malcolm Wilson, he discussed concepts such as loyalty and honor and stated, "When I resurrect on them * * * our presence going to be so powerful when we all back at that roundtable I can only hope the streets prepared for what's to come."

{¶ 28} Det. Johnson presented a PowerPoint presentation detailing the structure of the Heartless Felons and identified specific leaders within the gang's hierarchy. Det. Johnson identified Antonio Peterson, a.k.a L.A. Pone, as the president of the Heartless Felons. He has the title "Godfather." Below the Godfather, there are "Head N[——]s In Charge" or "HNIC," five star generals, bosses, underbosses, and godsons, etc. Each particular rank has a specific role in the gang and answers to people above them in the chain of command. For example, bosses supervise 200 or more members and must finance "the family." (Tr. 2428.) Underbosses keep track of all the bosses and are responsible for carrying out "hits" ordered by the Godfather. Godsons must be present at all meetings and carry out hits on unruly members. (Tr. 2428.) If a member breaks a rule, a godson may place the offending member on a disciplinary plan. (Tr. 2428.) A general is an aggressive person who carries out all hits ordered by the high counsel. Chief of soldiers "shed the most," which means they shed the most blood. (Tr. 2428.)

{¶ 29} Det. Johnson defined other terms commonly used by the Heartless Felons that were not defined for the jury. The phrase "based on a true story" means that a member has been disloyal and gives a loyal member permission to assault or even kill the disloyal member. The words "Blatt Blatt" or "bbllaaatttt," which are meant to mimic the sound of a machine gun, indicate something is going to happen. Earlier in the trial, a witness named Robert Ivory ("Ivory") testified that he observed a man wearing a red hoodie, standing by a car outside Club Fly Hygh, on the night of Marks's murder. Ivory heard a voice call "Black Black or something like that," and the man by the car, whom Ivory did not know, acknowledged those words.

{¶ 30} Det. Johnson described specific gang activities. He explained that the Heartless Felons make money for their organization by committing robberies and burglaries and selling illegal guns and drugs. They also raise money by presenting live concerts and selling T-shirts. Det. Johnson referred to previously authenticated text messages in which Webster instructed others to "hit a lick," which means "commit a robbery." Webster also advised other members about scheduled meetings via text messages while traveling between Canton and Cleveland between August 1, 2013 and October 1, 2013.

{¶ 31} On August 12, 2013, Webster engaged in a lengthy text message exchange with an apparently new member, Derrick Durden ("Durden"). Durden demonstrated his knowledge and loyalty to the gang by reciting important historical dates, recounting the gang's 10 golden rules, and the Heatless Felons' prayer. Webster later called Durden from the jail on November 27, 2013, seeking his assistance in alerting Dawayne Arnold that he was indicted for the aggravated robbery against Rodtez Woody. According to Det. Johnson, Webster used his Instagram page to communicate with members and thereby further the interests of the gang. On his Instagram account, Webster referred to two of his closest members, Lewis Arnold and Dawayne Arnold, as a "bloodline of bosses."

8

{¶ 32} Det. Johnson identified specific leaders of the gang and their assigned territories. One was in charge of the East 30th and Cedar area before going to prison. Another member controlled upper St. Clair and the Lakeshore area. Julius Webster controlled the lower St. Clair and Canton areas. Det. Johnson presented certified copies of indictments and judgments of conviction of each of these members to show their pattern of criminal gang activity.

{¶ 33} Based on this evidence, the court found Webster guilty of all gang-related counts and specifications, and having weapons while under disability charges. The jury found Webster guilty of the aggravated robbery and murder of Curtis Marks, with one-and three-year firearm specifications, the aggravated robbery of the B & B mart in Canton, with one- and three-year firearm specifications, and attempted tampering with evidence in Canton, with one- and three-year firearms specifications. The court found Webster guilty of gang and repeat violent offender specifications attendant to the aggravated robbery and murder charges.

*State v. Webster*, 2016 WL 1593052, at *2-7 (Ohio Ct. App.).[2]

**PROCEDURAL HISTORY**

State Court Conviction

In May 2014, a Cuyahoga County grand jury issued an indictment charging Petitioner with participating in a criminal gang (Count 1), aggravated murder (Counts 2-3), aggravated robbery (Counts 4, 10, 13), murder (Count 5), felonious assault (Count 6), kidnapping (Counts 7, 14), having weapons under disability (Counts 9, 12, 15), attempted evidence tampering (Count 11), escape (Count 17), obstructing justice (Count 20), retaliation (Count 21), and intimidation of crime victim or witness (Count 22). (Ex. 1, Doc. 5-1, at 4-23). Many of these charges included firearm, criminal gang activity, and repeat violent offender specifications. *See id.* As described in the facts set forth above, these charges arose out of "four separate incidents". *Webster*, 2016 WL 1593052, at ¶3. These were: 1) an escape; 2) a convenience store robbery; 3) the carjacking of Rodtez Woody's car; and 4) the murder of Curtis Marks. *See id.* at ¶8-17. The prosecution also included

2. Although Petitioner presents a different description of this evidence, he has not argued, nor has he shown by the required clear and convincing evidence that the state court's determination of the facts was erroneous. *See* 28 U.S.C. § 2254(e)(1).

charges that Petitioner improperly influenced the carjacking prosecution. *Id.* at ¶18-25. Petitioner pleaded not guilty to all charges. (Ex. 2, Doc. 5-1, at 25).

Prior to trial, Petitioner filed a motion to sever. (Ex. 5, Doc. 5-1, at 37-44). Specifically, he argued that the convenience store robbery, murder, and carjacking were unrelated offenses, and their joinder for trial would be prejudicial. *See id.* Petitioner also argued venue was not proper for the convenience store robbery because it took place in Stark County, not Cuyahoga County. *See id.* After briefing and arguments, the trial court denied the motion, finding that "the offenses share a commonality with regard to temporal proximity, were committed while the defendant was being sought on escape charges out of Cuyahoga County, and arguably fall under the umbrella of being committed as part of gang activity as charged in the indictment." (Ex. 6, Doc. 5-1, at 45).

Petitioner also filed a pretrial Motion *in Limine* to prevent the State from introducing at trial evidence related to Petitioner's criminal gang activity, possession of firearms, and "references in any way to Heartless Felons gang." (Ex. 3, Doc. 5-1, at 27). Petitioner argued such evidence was irrelevant because he intended to waive his jury trial right on the gang and repeat violent offender specifications, as well as "of witness intimidation counts or specifications which would arguably allow the State to produce evidence of gang activity or other acts evidence before the jury." *Id.* at 29. After argument on the motion, the trial court granted in part and denied in part Petitioner's motion. (Ex. 4, Doc. 5-1, at 34-36). Specifically, the court held that "the State has every right to establish a relationship between the relevant actors in each case herein, and if that evidence includes mutual participation in the Heartless Felons, then the Court is of the position that such evidence is relevant and as such admissible." *Id.* at 36. Further, the Court held that Petitioner's gang affiliation was relevant to motive. *Id.* Thus, the court held the State could "make limited reference to the Heartless Felons organization as that information relates to relationships

between various characters involved in the events involved in the instant matter and to show what it believes to be [] a motive for committing the crimes alleged in the Indictment." *Id.*[3]

The case proceeded to trial. At the conclusion of the State's case, Petitioner moved for a judgment of acquittal under Ohio Criminal Rule 29. (Tr. 2129-40).[4] The trial court granted the motion in part: it amended Count 13 from aggravated robbery to robbery (without the firearm specification); and it eliminated the firearm specification from the kidnapping charge in Count 14. *Id.* at 2152-53. It denied the remainder of the motion. *Id.* at 2153-54.

While the jury deliberated, the trial court held a bench trial on the bifurcated charges – the escape charge, having weapons under disability, and participation in a criminal gang. *See* Tr. 2364. At the close of the State's case, Petitioner again moved for a judgment of acquittal. (Tr. 2506-11). The trial court granted the motion as to the having weapons under disability charge in Count 15. (Tr. 2527-28). It also amended Counts 21 (retaliation) and 22 (intimidation) to attempt offenses. (Tr. 2517). It denied the motion in all other respects. (Tr. 2528-29).

As the state court summarized:

> Based on this evidence, the court found Webster guilty of all gang-related counts and specifications, and having weapons while under disability charges. The jury found Webster guilty of the aggravated robbery and murder of Curtis Marks, with one-and three-year firearm specifications, the aggravated robbery of the B & B mart in Canton, with one- and three-year firearm specifications, and attempted tampering with evidence in Canton, with one- and three-year firearms specifications. The court found Webster guilty of gang and repeat violent offender specifications attendant to the aggravated robbery and murder charges.

*Webster*, 2016 WL 1593052, at ¶ 33. The jury acquitted Petitioner on the aggravated murder counts, felonious assault count, and kidnapping count related to the Marks murder. (Tr. 2529-31).

---

3. Petitioner also filed a pretrial motion to suppress, which the trial court denied. *See* Ex. 36, Doc. 5-1, at 484-94; Exs. 7-8, Doc. 5-1, at 46-50.

4. The trial transcript is available at Doc. 6.

It also acquitted Petitioner on the aggravated robbery and kidnapping charges related to the Woody carjacking. (Tr. 2545).

On March 10, 2015, the trial court sentenced Petitioner to an aggregate 99 years to life in prison. (Ex. 11, Doc. 5-1, at 58).[5]

Direct Appeal

Petitioner filed a timely appeal with the Ohio Eighth District Court of Appeals. (Ex. 15, Doc. 5-1, at 92). In his brief, he raised twelve assignments of error:

1. The trial court denied Julius Webster a fair trial when it failed to sever three unrelated cases and thereby caused Webster undue prejudice.

2. The trial court violated Julius Webster's rights to due process and a fair trial by allowing the prosecution to taint the jury by repeatedly exposing it to irrelevant and highly prejudicial information about his affiliation with a notorious street gang.

3. The trial court violated Julius Webster's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments as established in *Batson v. Kentucky*, 476 U.S. 79 (1986), along with his rights to due process and equal protection, when it permitted the prosecution to exercise a peremptory challenge to remove a prospective African-American juror based on her race.

4. The trial court erred in finding that the State proved venue beyond a reasonable doubt in the Stark County robbery (Counts 10 and 11) and in instructing the jury that, as a matter of law, the state had proven venue on those two counts.

5. The State failed to present legally sufficient evidence to support a conviction for obstructing justice (Count 20).

6. Julius Webster's murder conviction (Count 4) should be vacated because the jury acquitted him on the underlying felonious assault and the trial court violate[d] his right to due process when it denied his motion pursuant to Crim. R. 29(C)(3) in light of that development.

7. Defendant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution because counsel failed to elicit evidence at

---

5. Prior to sentencing, Petitioner also filed a motion for acquittal or alternatively, a new trial (Exs. 12-13, Doc. 5-1, at 61-89), which the trial court denied (Ex. 14, Doc. 5-1, at 90).

trial of non-compliance with the statutory photo lineup procedures in R.C. 2933.83 and failed to request a jury instruction related to that non-compliance.

8. Webster's right to due process and a fundamentally fair trial were violated by the prosecutor's improper remarks during closing argument.

9. The trial court improperly admitted a witness's out-of-court statement made during a police interview in violation of the rules of evidence and Mr. Webster's state and federal right to confrontation.

10. The trial court violated the Defendant's state and federal due process right to a fair trial when it improperly provided a flight or "consciousness of guilt" instruction without sufficient factual basis to support such an instruction.

11. Defendant was denied effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Section 10 of the Ohio Constitution due to a series of errors committed by counsel.

12. The trial court's conduct of this trial evidences a bias that violated Webster's right to the presumption of innocence and a fair trial.

(Ex. 16, Doc. 5-1, at 104-05) (capitalization altered). The State filed a responsive brief (Ex. 17, Doc. 5-1, at 185-260), and Petitioner filed a reply (Ex. 18, Doc. 5-1, at 261-75).

On April 21, 2016, the Ohio appellate court issued an opinion largely affirming the trial court judgment. *Webster*, 2016 WL 1593052; (Ex. 19, Doc. 5-1, at 277-337). The court overruled Petitioner's first through fourth, and sixth through twelfth assignments of error. *Webster*, 2016 WL 1593052, at ¶¶ 35-84, 92-149. The appellate court sustained Petitioner's fifth assignment of error in part, modifying Count 20 – the obstruction of justice charge – to attempted obstruction of justice, and remanded the case to the trial court for the limited purposes of resentencing on that count. *See id.* at ¶¶ 85-91, 150; *see also* Ex. 24, Doc. 5-1, at 373. Count 20 was dismissed – on the State's motion – after remand. *See* Exs. 25-27, Doc. 5-1, at 374-78.

Petitioner filed a timely notice of appeal to the Ohio Supreme Court. (Ex. 20, Doc. 5-1, at 338-39). In his memorandum in support of jurisdiction, Petitioner set forth five propositions of law:

1. A criminal defendant is denied a fair trial as required by state and federal due process when a single jury hears evidence of three unrelated cases and irrelevant, inflammatory evidence of gang membership.

2. Even if evidence of joined crimes is "separate and distinct," severance is nonetheless required if the reason for joinder is substantially outweighed by the danger of unfair prejudice.

3. Removal of a prospective African-American juror based on race violates the accused's right to due process and equal protection. A violation of this well established princip[le] constitutes structural error and requires reversal.

4. Venue must be proven by the prosecution beyond a reasonable doubt and the trial court may not instruct the jury that, as a matter of law, the state had proven venue.

5. The accused's state and federal due process right to a fair trial is violated when the court improperly instructs the jury regard[i]ng flight or "consciousness of guilt" without sufficient supporting factual basis.

(Ex. 21, Doc. 5-1, at 340-56). The State filed a responsive memorandum (Ex. 22, Doc. 5-1, at 357-71), and on September 14, 2016, the Ohio Supreme Court declined to accept jurisdiction of the appeal (Ex. 23, Doc. 5-1, at 372).

### FEDERAL HABEAS CORPUS

Before this Court, Petitioner raises three grounds for relief:

**GROUND ONE**: The accused's right to due process and a fair trial are violated where a single jury hears evidence underpinning three unrelated cases and irrelevant, inflammatory evidence of gang membership.

**GROUND TWO:** Removal of a prospective African American juror based on race violated the accused's rights to due process and equal protection. This error is structural and requires a new trial.

14

**GROUND THREE:** Venue is an element of the offense that must be proved beyond a reasonable doubt and the trial court violates a defendant's rights to due process., a fair trial, and the presumption of innocence by instructing the jury that the State had proven this element.

(Doc. 1, at 6, 8, 9); *see also* Doc. 1-1 (memorandum in support of Petition).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "dictates a highly deferential standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted). An application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d). Thus, a court may grant habeas relief if the state court arrives at a conclusion that is contrary to a decision of the Supreme Court on a question of law, or if the state court decides a case differently than did the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000).

The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. Id. at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the

claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

**DISCUSSION**

Petitioner raises three grounds for relief. *See* Doc. 1. Respondent asserts the Petition must be denied because each ground is non-cognizable or meritless. *See* Doc. 5. For the reasons discussed below, the undersigned recommends the Petition be denied.

Ground One

In Ground One, Petitioner argues his due process rights were violated when the trial court failed to sever unrelated cases and permitted the jury to hear "irrelevant and inflammatory" evidence of Petitioner's gang membership. (Doc. 1-2, at 16-20). Respondent contends this Ground is non-cognizable, and that Petitioner has not shown that the state court decision as contrary to, or an unreasonable application of federal law. (Doc. 5, at 23-30). Petitioner does not respond to this argument. *See* Doc. 10, at 1 ("In this Traverse, Petitioner addresses only the Warden's argument opposing Ground Two.").

*Failure to Sever*

There are no Supreme Court cases holding that a defendant in a criminal case has a constitutional right to a separate trial on each of the charges against him. *See, e.g.*, *Rodriguez v. Jones*, 625 F. Supp. 2d 552, 560–61 (E.D. Mich. 2009). Joinder "has long been recognized as a constitutionally acceptable accommodation of the defendant's right to a fair trial." *Herring v. Meachum*, 11 F.3d 374, 377 (2d Cir. 1993). On habeas review of state court convictions, the question is not whether the joinder of charges or the refusal to sever counts for separate trials violated a state procedural rule, but whether the petitioner was denied due process of law under

16

the Fourteenth Amendment. *See Davis v. Coyle*, 475 F.3d 761, 777 (6th Cir. 2007) (citing *Corbett v. Bordenkircher*, 615 F.2d 722, 724 (6th Cir. 1980)).

The state court addressed Plaintiff's failure-to-sever argument on direct appeal:

{¶ 35} In the first assignment of error, Webster argues the trial court erred in failing to grant his motion to sever counts in the indictment.

{¶ 36} Under Crim.R. 8(A), two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Indeed, " '[t]he law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character.' " *State v. Lott,* 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990), quoting Crim.R. 8. *See also State v. Dean,* Slip Opinion No. 2015–Ohio–4347, ¶ 59.

{¶ 37} However, if it appears that a defendant would be prejudiced by the joinder, a trial court may grant a severance pursuant to Crim.R. 14. *State v. Diar,* 120 Ohio St.3d 460, 2008–Ohio–6266, 900 N.E.2d 565, ¶ 94. To prevail on a claim that the trial court erred in denying a motion for severance, the defendant must affirmatively demonstrate that (1) his rights were prejudiced, (2) at the time of the motion to sever, he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) given the information provided to the court, it abused its discretion in refusing to separate the charges for trial. *State v. Schaim,* 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992), citing *State v. Torres,* 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus.

{¶ 38} The state may rebut a defendant's claim of prejudicial joinder in two ways. First, a defendant is not prejudiced by joinder if the evidence would have come in as other acts evidence under Evid.R. 404(B). *Lott,* 51 Ohio St.3d 160 at 163, 555 N.E.2d 293. Under the second method, the state is not required to meet the stricter "other acts" admissibility test, but is simply required to show that evidence of each crime joined at trial is simple and direct. *Id.,* citing *State v. Roberts,* 62 Ohio St.2d 170, 175, 405 N.E.2d 247 (1980); *Torres.* Thus, a defendant is not prejudiced by joinder where the joined offenses are " 'simple and direct, so that a jury is capable of segregating the proof required for each offense.' " *State v. Ferrell,* 8th Dist. Cuyahoga No. 100659, 2014–Ohio–4377, ¶ 39, quoting *State v. Fletcher,* 2d Dist. Clark No.2003–CA–62, 2004–Ohio–4517, ¶ 41. *See also Lott* at 163, 555 N.E.2d 293.

{¶ 39} There was separate and distinct evidence to establish Webster's guilt as to each offense. The owner and store clerk of the B & B Mart and Canton police officers testified about the robbery that occurred there. Canton detectives testified

17

that one of Webster's fingerprints was found on the VCR behind the counter, and his DNA was found on a hat discovered outside the B & B Mart that was identical to the hat worn by the robber who attempted to remove the tape from the VCR. The jury could not confuse this evidence with evidence of the offenses that occurred in Cleveland.[1]

{¶ 40} The robbery of Rodtez Woody's vehicle and the robbery and murder of Marks occurred at different locations on different days and involved different actors and witnesses. Investigators found Webster's and Dawayne Arnold's fingerprints on Woody's vehicle. By contrast, the evidence establishing Webster's guilt with respect to Marks's murder came from eyewitness testimony as well as Webster's admissions in the letters he attempted to send to his girlfriend and other members of the Heartless Felons.

{¶ 41} Webster committed each of these crimes while on postrelease control and while there was a warrant out for his arrest for failing to report to his parole officer. Evidence showed that the Heartless Felons fund their organization, in part, through robberies and burglaries. Indeed, bosses have a duty to finance the family, and evidence showed that Webster was the head of the St. Clair and Canton territories. Thus, a reasonable inference could be made that Webster committed the robbery in Canton for the purpose of funding the Heartless Felons.

{¶ 42} There was separate and distinct evidence to support each count in the indictment. Moreover, the evidence showed that the offenses shared a common purpose, motive, or scheme, and were thus part of the kind of course of criminal conduct contemplated by Crim.R. 8. Under these circumstances, we cannot say the trial court abused its discretion in denying Webster's motion to sever counts in the indictment.

{¶ 43} Therefore, the first assignment of error is overruled.

*Webster*, 2016 WL 1593052, at *8-9.

Petitioner has not shown this determination to be contrary to, or an unreasonable application of federal law. In a case cited by Petitioner (*see* Doc. 1-2, at 19), the Supreme Court stated (in a footnote) that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder [constitutes] a constitutional violation only if it results in prejudice so great as to deny a defendant his . . . right to a fair trial." *United States v. Lane*, 474 U.S. 438, 446 n.8 (1986); *see also Davis*, 475 F.3d at 777 (quoting *Lane*). The Sixth Circuit, however, has ruled that *Lane*'s language regarding the failure to sever criminal charges is simply dicta and thus not clearly

18

established federal law that would justify federal habeas relief. *See Mayfield v. Morrow*, 528 F. App'x 538, 541–42 (6th Cir. 2013) (quoting *Williams*, 529 U.S. at 412) ("Thus, as to Mayfield's severance claim, *Lane* does not clearly establish anything."); *accord Collins v. Runnels*, 603 F.3d 1127, 1132 (9th Cir. 2010) ("The language upon which Collins refers is dicta. *Lane* dealt with the joinder of standards under Federal Rules of Criminal Procedure 8 and 52; no constitutional issue was before the Court."); *see also Roberson v. Stephens*, 614 F. App'x 124, 135 (5th Cir. 2015) (expressing "grave doubts that two sentences of dicta in a footnote [in *Lane*] could constitute 'clearly established Federal law, as determined by the Supreme Court'") (quoting 28 U.S.C. § 2254(d)(1)).

Even were *Lane* applicable on federal habeas review, Petitioner cannot obtain relief unless he can show actual prejudice resulting from the trial court's failure to sever. *See Coley v. Bagley*, 706 F.3d 741, 753 (6th Cir. 2013) ("Misjoinder is not per se unconstitutional, but rises to that level if it results in prejudice so great as to deny a defendant his due process right to a fair trial."); *see also Davis*, 475 F.3d at 777 (to obtain habeas relief, a petitioner must demonstrate "*actual* prejudice, not merely the *potential* for prejudice") (emphasis in original). The state appellate court's determination that Petitioner failed to establish prejudice from the joinder of the offenses because the evidence of each was "simple and direct", *see Webster*, 2016 WL 1593052, at ¶38-42, was reasonable and is not contrary to or an unreasonable application of federal law. Moreover, as further evidence that the jury was not unduly prejudiced by the joinder and was able to consider each charge separately, Respondent points out that the jury acquitted Petitioner on numerous charges. *See* Doc. 5, at 26. Petitioner has not shown the joinder deprived him of a fundamentally fair trial. For these reasons, the undersigned recommends Petitioner's failure-to-sever / misjoinder claim be denied.

*Evidence of Gang Membership*

In the second part of Ground One, Petitioner contends his due process rights were violated when the trial court permitted the jury to hear irrelevant evidence of his gang membership even though he tried the independent gang charges and specifications to the bench. (Doc. 1-2, at 19-20). Respondent asserts that the state court's evidentiary ruling did not result in a denial of fundamental fairness, and therefore, Petitioner is not entitled to habeas relief. (Doc. 5, at 27-30).

"With regard to evidentiary rulings, the standard for habeas relief is not easily met." *Wilson v. Sheldon*, 874 F.3d 470, 475 (6th Cir. 2017). "[F]ederal habeas courts review state court evidentiary decisions only for consistency with due process." *Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001). "A state court evidentiary ruling will be reviewed by a federal habeas court only if it were so fundamentally unfair as to violate the petitioner's due process rights." *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001); *see also Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (such rulings "are usually not to be questioned in a federal habeas corpus proceeding") (quoting *Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988)). If a ruling is especially egregious and "results in a denial of fundamental fairness, it may violate due process and thus warrant habeas relief." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003) (citing *Coleman*, 244 F.3d at 542). Importantly, however, as a general matter, "state-court evidentiary rulings cannot rise to the level of due process violations unless they 'offend[ ] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour*, 224 F.3d at 552 (quoting *Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)). "Ultimately, states have wide latitude with regard to evidentiary matters under the Due Process Clause." *Wilson*, 874 F.3d at 476 (citing *Seymour*, 224 F.3d at 552).

The state court rejected Petitioner's argument on direct appeal:

{¶ 44} In the second assignment of error, Webster argues the trial court violated his constitutional rights to due process and a fair trial by allowing the jury to hear highly prejudicial information about his affiliation with the Heartless Felons. He contends that because he bifurcated all charges and specifications related to gang activity, there was no reason for the jury to hear any evidence pertaining to the Heartless Felons whatsoever. He contends any evidence of gang activity was irrelevant and unfairly prejudicial.

{¶ 45} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Morris,* 132 Ohio St.3d 337, 2012–Ohio–2407, 972 N.E.2d 528, syllabus. We, therefore, will not disturb the trial court's judgment absent an abuse of discretion.

{¶ 46} Relevant evidence is admissible unless prohibited by an evidentiary rule, statute, or constitutional provision. Evid.R. 402. Evid.R. 403(A) provides that relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. Although most evidence presented by the state is prejudicial, not all evidence is unfairly prejudicial. *State v. Skatzes,* 104 Ohio St.3d 195, 2004–Ohio–6391, 819 N.E.2d 215 ¶ 107. The court must balance the prejudicial effect of evidence against its probative value.

{¶ 47} Evid.R. 404(B) provides that evidence of other acts is inadmissible to prove that the accused acted in conformity with his bad character. However, evidence of prior "bad acts" may be admitted for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Evid.R. 404(B). *See also* R.C. 2945.59 (a correlating statute). These exceptions must be construed against admissibility. *State v. Coleman,* 45 Ohio St.3d 298, 299, 544 N.E.2d 622 (1989), *cert. denied,* 493 U.S. 1051, 110 S.Ct. 855, 107 L.Ed.2d 849 (1990).

{¶ 48} However, if other acts evidence tends to establish an exception, it can be presented even if it negatively affects the defendant's character. *See State v. Jamison,* 49 Ohio St.3d 182, 185, 552 N.E.2d 180 (1990); *State v. Broom,* 40 Ohio St.3d 277, 533 N.E.2d 682 (1988), paragraph one of the syllabus.

{¶ 49} Evidence of gang membership undoubtedly creates some risk of unfair prejudice. *See United States v. Jobson,* 102 F.3d 214, 219 (6th Cir.1996), fn. 4. Nevertheless, the Ohio Supreme Court has held that evidence of a defendant's gang affiliation is admissible pursuant to Evid.R. 404(B) to show motive. *State v. Bethel,* 110 Ohio St.3d 416, 2006–Ohio–4853, 854 N.E.2d 150, ¶ 170. This is particularly the case where "the interrelationship between people is a central issue." *Id.,* quoting *United States v. Gibbs,* 182 F.3d 408, 430 (6th Cir.1999).

{¶ 50} Ideally, all evidence of Webster's gang affiliation would be excluded. However, the state has every right to establish a relationship between the relevant

actors, if necessary to prove its case. Moreover, the trial court did not give the state carte blanche to introduce any and all evidence of Webster's gang activities. The court specifically excluded evidence of Webster's prior convictions and "any expert testimony regarding specifics of the organization or any other evidence specifically designated for purposes of proving the counts in the indictment that relate solely to gang participation." (Journal Entry dated Jan. 9, 2015, R. at 60.) Thus, the court only allowed the state to make limited reference to the Heartless Felons (1) as it related to relationships between people involved in the non-gang offenses, and (2) to show what it believed was the motive for committing the crimes alleged in the indictment.

{¶ 51} Some evidence of Webster's gang involvement was necessary to prove the non-gang-related charges. For example, the state introduced evidence of Webster's letters to Golston and his November 27, 2013 jailhouse call to Derrick Durden to show his consciousness of guilt. One of the letters seemed to allude to an order to murder Rodtez Woody so there would be no witnesses to testify about that robbery. As previously stated, Webster attempted to warn Porter in a letter not to testify against him at trial. The letters, which required decoding, were written in gang lingo that had to be translated so the jury could understand them.

{¶ 52} Similarly, evidence of Webster's text messages and phone calls were necessary to prove Webster's locations at the time each crime was committed. The photograph taken on Golston's phone an hour before Marks was murdered was necessary to show that Webster was wearing a red hoodie at the time of Marks's murder as described by eyewitnesses. These pieces of evidence were probative of Webster's guilt and explained Webster's motive for the crimes. They were, therefore, admissible under Evid.R. 404(B).

{¶ 53} Accordingly, the second assignment of error is overruled.

*Webster*, 2016 WL 1593052 , at *9-11.

The state court decision was neither contrary to, nor an unreasonable application of federal law because it does not rise to the level of a due process violation. That is, Petitioner has not shown the allegedly improper admission of gang-related evidence "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. " *Egelhoff*, 518 U.S. at 43 (internal quotation and citation omitted). Although Petitioner argues that the admission of such evidence is "innately associated with the danger of unfair prejudice" (Doc. 1-2, at 19), he presents no clearly established federal law that its admission under the above-described

circumstances violated due process. Indeed, to the extent Petitioner argues that he was prejudiced because the jury would infer propensity, the Sixth Circuit in *Bugh v. Mitchell* explained:

> In this case, the admission of prior bad acts evidence was not contrary to clearly established Supreme Court precedent. There is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence. In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior injury evidence violated due process, thus warranting habeas relief. 502 U.S. 62, 75, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime. *Id.* at 75 n. 5, 112 S.Ct. 475. Moreover, in *Spencer v. Texas*, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967), the Supreme Court rejected the argument that the Due Process Clause requires the exclusion of prejudicial evidence, even though limiting instructions were given and a valid state purpose is served. *Id.* at 563-64, 87 S.Ct. 648. The Court recognized that it was not "a rule-making organ for the promulgation of state rules of criminal procedure. And none of the specific provisions of the Constitution ordains this Court with such authority." *Id.* at 564, 87 S.Ct. 648. While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States,* 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States,* 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms. Accordingly, the district court correctly found that there is no Supreme Court precedent that the trial court's decision could be deemed "contrary to," under AEDPA.

329 F.3d 496, 512-13 (6th Cir. 2003); *see also Bailey v. Lafler*, 722 F. App'x 425, 435 (6th Cir. 2018) ("*Bugh* held that as of 2003 there was no clearly established Supreme Court precedent holding that the admission of other bad acts as propensity evidence violated due process. Bailey cites no Supreme Court authority establishing such a principle since 2003 (or at all).") (citation omitted).

The state court reasonably found that the trial court's admission of the evidence was not improper because it related to issues before the jury. *Webster*, 2016 WL 1593052, at ¶¶ 51-52. But even if the evidence was not relevant, and was merely propensity evidence, habeas relief still would not be warranted under the AEDPA standard of review because the Supreme Court has

never held that the admission of propensity evidence violates due process. *See Bugh*, 329 F.3d at 512-13. Accordingly, it cannot be said that the state court's rejection of this claim either was contrary to or involved an unreasonable application of clearly established Supreme Court law. *See Knowles v. Mirsayance*, 556 U.S. 111, 122 (2009) (holding that "it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court"); *Wright v. Van Patten*, 522 U.S. 120, 126 (2008) (per curiam) ("Because our cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law." (internal quotation marks omitted)).

For these reasons, the undersigned recommends Ground One be denied in its entirety.

Ground Two:

In Ground Two, Petitioner contends the State violated the Equal Protection Clause and *Batson v. Kentucky*, 476 U.S. 79 (1986) in removing an African-American juror. He further contends that the state court decision applying harmless error analysis to this claim is an unreasonable application of federal law. Respondent asserts that the state court's analysis was not unreasonable and Ground Two should be denied.

"[T]he Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." *Batson*, 476 U.S. at 89. That is, "[p]urposeful racial discrimination in section of the venire violates a defendant's right to equal protection because it denies him the protection that a trial by jury is intended to secure. *Id.* at 86. The trial court's determination whether the prosecutor is using his peremptory challenges for that improper reason involves three steps. "[O]nce the opponent of a peremptory challenge has made

out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two)." *Purkett v. Elem*, 514 U.S. 765, 767 (1995). Step two does not demand an explanation that is "persuasive, or even plausible," so long as it is facially race-neutral. *Id.* at 767–68. If step two is satisfied, "the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination." *Id.* at 767. The critical question here is "the persuasiveness of the prosecutor's justification for his peremptory strike," *Cockrell*, 537 U.S. at 338–39 – quite simply, whether the trial court finds the prosecutor's race-neutral explanations credible or pretextual. *See id.* at 339.

Further, the Sixth Circuit has explained that "[i]n addition to the highly deferential standard AEDPA imposes, *Batson* claims are also subject to highly deferential review." *Bryan v. Bobby*, 83 F.3d 1099, 1110 (6th Cir. 2006). The court further explained:

> The trial court's decision on the ultimate question of improper discriminatory intent is a finding of fact to be accorded "great deference." *Hernandez v. New York*, 500 U.S. 352, 364–65, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality). "Deference is necessary because a reviewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court is to make credibility determinations." *Cockrell*, 537 U.S. at 339, 123 S.Ct. 1029; *see also Hernandez*, 500 U.S. at 365, 111 S.Ct. 1859 ("[E]valuation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' ") quoting *Witt*, 469 U.S. at 428, 105 S.Ct. 844. In addition, a *Batson* claim "presents a mixed question of law and fact and 'necessarily focuses on the reasonableness of the decision of the state courts....'" *Braxton*, 561 F.3d at 458 (quoting *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003)). The "question of 'whether a prosecutor intended to discriminate on the basis of race in challenging potential jurors is, as *Batson* recognized, a question of historical fact.'" *Lancaster,* 324 F.3d at 429 (quoting *Hernandez, 500* U.S. at 367, 111 S.Ct. 1859). Thus, the deference given to district courts "must be modified in the context of a § 2254 petition to give credence to § 2254(e)(1)'s requirement that facts found by a state court be presumed correct unless the petitioner rebuts this presumption by clear and convincing evidence." *Braxton*, 561 F.3d at 458 (citing *Lancaster*, 324 F.3d at 429 n.1).

*Id.* at 1110-11.

The state appellate court rejected Petitioner's *Batson* claim on direct review:

{¶ 54} In the third assignment of error, Webster argues the trial court erred when it allowed the prosecutor to exercise a peremptory challenge to remove a prospective African–American juror on account of her race. He contends the peremptory challenge violated his constitutional rights to due process and equal protection in violation of *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

{¶ 55} In *Batson,* the United States Supreme Court held that purposeful discrimination in the use of peremptory challenges to exclude members of a minority group violates the Equal Protection Clause of the United States Constitution. *Id.* at 82. The *Batson* court set forth a three-step procedure for determining whether a peremptory strike violates equal protection.

{¶ 56} First, the opponent of the peremptory strike must make a prima facie case of racial discrimination. *Id.* at 96. To establish a prima facie case of purposeful discrimination in jury selection, the accused must demonstrate (1) that members of a recognized racial group were peremptorily challenged, and (2) that the facts and circumstances raise an inference that the prosecutor used the peremptory challenge to exclude the jurors because of their race. *Id.*

{¶ 57} Second, if the trial court finds that the opponent has set forth a prima facie case, then the proponent of the strike must come forward with a racially neutral explanation for the strike. *Id.* at 97–98. However, the "explanation need not rise to the level justifying exercise of a challenge for cause." *Id.* at 97. Finally, if the proponent puts forth a racially neutral explanation, the trial court must decide, based on all the circumstances, whether the opponent has proven purposeful racial discrimination. *Id.*

{¶ 58} During the third step of the *Batson* inquiry, the court "must examine the prosecutor's challenges in context to ensure that the reason is not merely pretextual." *State v. Frazier,* 115 Ohio St.3d 139, 2007–Ohio–5048, 873 N.E.2d 1263, ¶ 65. The judge must "assess the plausibility" of the prosecutor's reason for striking the juror "in light of all evidence with a bearing on it." *Miller–El v. Dretke,* 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005). "[T]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam); *Rice v. Collins,* 546 U.S. 333, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006).

{¶ 59} A trial court's finding of no discriminatory intent will not be reversed on appeal unless it was clearly erroneous. *State v. Hernandez,* 63 Ohio St.3d 577, 583, 589 N.E.2d 1310 (1992), following *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). This deferential standard arises from the fact

that the third step of the *Batson* inquiry turns largely on the trial court's evaluation of credibility. *See State v. Herring,* 94 Ohio St.3d 246, 257, 2002–Ohio–796, 762 N.E.2d 940, citing *Batson,* at 98.

{¶ 60} Defense counsel objected to the state's peremptory challenge to excuse juror No. 11, arguing her removal would violate *Batson.* Defense counsel explained the basis for the challenge in order to establish a prima facie case of discrimination, stating:

> We have a *Batson* challenge, your Honor. Number One and Number Two are people of color that are excused for cause. The[re] [are] three remaining minority jurors. There is no reason for a pattern to be shown, but we are objecting to the removal of No. 11 by the prosecutor.

{¶ 61} In response, the court stated: "Before I let [the prosecutor] speak, I can think of about a dozen reasons why she would be excused from the panel." (Tr. 724.) The prosecutor then began to argue why there was no *Batson* violation by explaining there was no pattern of discrimination since the first two jurors were excused for cause. He asserted that "race had nothing to do with the for cause reasons they were excused."

{¶ 62} Before the prosecutor could continue his argument, the trial court interrupted him and stated: "I apologize for the comment. I am just saying that there is plenty of other reasons that I could see her being removed." The court noted defense counsel's objection and proceeded with voir dire without any further discussion.

{¶ 63} Webster contends the court's failure to allow the state to present a race-neutral reason for excusing juror No. 11 violated *Batson* and constituted a structural error that demands reversal. Webster cites *Rivera v. Illinois,* 556 U.S. 148, 129 S.Ct. 1446, 173 L.Ed.2d 320 (2009), to support his argument. However, in *Rivera,* the United States Supreme Court held that a state court's erroneous denial of a peremptory strike did not amount to a deprivation of a defendant's Fourteenth Amendment due process right and was thus subject to harmless error review. *Id.* at 152.

{¶ 64} We recognize that *Rivera* involved an alleged deprivation of the defendant's exercise of a peremptory challenge, whereas this case involves the state's use of a peremptory challenge to remove a juror, who was a minority. Nevertheless, we find no structural error in the venire process that would warrant reversal in this case.

{¶ 65} Structural errors are those errors that " 'are so intrinsically harmful as to require automatic reversal (i.e., "affect substantial rights") without regard to their effect on the outcome.' " *State v. Hill,* 92 Ohio St.3d 191, 196, 2001–Ohio–141, 749 N.E.2d 274, quoting *Neder v. United States,* 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). The United States Supreme Court has held that there is "a

narrow class of errors" that qualify as structural errors "that are so serious that they defy harmless error analysis. A structural error is a 'defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself.' " *Lainfiesta v. Artuz,* 253 F.3d 151 (2d Cir.2001), quoting *Arizona v. Fulminante,* 499 U.S. 279, 309–310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶ 66} The cases in which the Supreme Court has found a structural error are few in number and involve an egregious violation of the defendant's rights that undermined the integrity of the proceeding. *Lainfiesta,* citing *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable doubt instruction); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (denial of public trial); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge). "Errors of this magnitude are per se prejudicial and require that the underlying conviction be vacated." *Lainfiesta* at 157, citing *Neder,* at 8–9.

{¶ 67} Although the court's interruption precluded the prosecutor from explaining his race-neutral reasons for dismissing juror No. 11, the important fact is that the court allowed Webster to make his prima facie case of discrimination. This is not a case where the court refused to hear the defendant's *Batson* claim. Therefore, Webster was not deprived of due process, and there was no structural error.

{¶ 68} We recognize, nonetheless, that the court erred in depriving the state of its duty to explain its reasons, but we find this error harmless. As previously stated, the trial court concluded the *Batson* hearing before the state could provide its race-neutral reasons because the court found numerous legitimate reasons for dismissal on its own. The record supports the court's conclusion.

{¶ 69} During voir dire, juror No. 11 stated that her next door neighbor worked at the Maple Heights jail, and that it would be a "situational thing" whether she could hold police officers to the same standard as lay witnesses regarding their credibility. She also stated she thought a lawyer treated her son unfairly during his personal injury case because he stereotyped him. (Tr. 60.)

{¶ 70} Juror No. 11 showed some confusion about her responsibility to determine whether the defendant violated any laws. She thought that by deciding guilt or innocence of an individual the state was making her responsible for that person's failure to follow the law. (Tr. 423–424.) She felt she would not be able to keep the victim's family and the defendant's family out of her mind during deliberations. (Tr. 370–371.)

28

{¶ 71} Additionally, juror No. 11 had preconceived ideas about the quality of the evidence that would be presented during the trial. She stated: "[W]hat's most important, that you are not just giving me a piece or two, that you have all it takes to convince me that this is what had been done and there is no chance that just the two pictures can be, you know, cropped and, you know, manipulated." (Tr. 467–468.)

{¶ 72} Juror No. 11's comments revealed she would have had difficulty remaining fair and impartial. This is an appropriate race neutral reason for seeking to excuse a juror. Nevertheless, Webster contends the court's failure to strictly comply with the three-step analysis described in *Batson* automatically warrants reversal of his convictions pursuant to *State v. Saunders,* 8th Dist. Cuyahoga No. 102731, 2016–Ohio–292.

{¶ 73} In *Saunders,* the trial court summarily dismissed a *Batson* claim made against the state's first peremptory challenge. The trial court in *Saunders* stated, "this is his only challenge so far. There are a number of other minorities, so there has to be a pattern." On appeal, this court reversed the defendant's conviction pursuant to *Batson,* holding that "[o]nce the defense challenged a juror's dismissal based on the juror's race, it was incumbent on the court to conduct a *Batson* hearing to decide if there was merit to defense counsel's challenge." *Id.* at ¶ 6.

{¶ 74} We find *Saunders* distinguishable from the facts presented in this case. There was no evidence in *Saunders* suggesting that the excused juror was incapable of being fair and impartial. Indeed, the court in *Saunders* found that the trial court did not conduct a *Batson* hearing at all. In this case, Webster made his prima facie case of discrimination, and the state presented part of its race-neutral explanation, when the court interrupted and conducted its own analysis based on the evidence. Juror No. 11 showed an inability to be objective and to keep an open mind. Indeed, her premature suspicion that evidence would be "manipulated," coupled with her opinion that the credibility of police officers should be judged according to a different standard than lay witnesses, indicated an unfair prejudice against the state.

{¶ 75} Although the court's hearing did not strictly comply with the three-step procedure outlined in *Batson,* the hearing was sufficient to protect Webster's right to due process, and any error in procedure was harmless beyond a reasonable doubt.

*Webster*, 2016 WL 1593052, at *11-15; *see also* Tr. 727-28 (exchange regarding *Batson* challenge).

The core of the dispute between Petitioner and Respondent before this Court is whether harmless error analysis can ever be applied to a *Batson* challenge. Petitioner argues that a *Batson* error is necessarily structural and therefore not subject to harmless error review, even in a habeas

context. Respondent contends that Petitioner has not shown the state appellate court determination that any *Batson* error was harmless beyond a reasonable doubt was contrary to, or an unreasonable application of, federal law.

At the outset, the undersigned reiterates that "[t]he question is not whether [this] court believes the state court's determination . . . was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Knowles*, 556 U.S. at 123. This Court must ask "whether 'there is any reasonable argument' supporting the state court's conclusion." *Cullen v. Pinholster*, 563 U.S. 170, 229 (2011) (quoting *Harrington*, 562 U.S. at 89). That is, a state court's decision can only be considered "unreasonable" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Harrington*, 562 U.S. at 102.

"Structural errors" are errors that affect the "entire conduct of the trial from beginning to end." *Arizona v. Fulminante*, 499 U.S. 279, 309 (1991). They differ from trial errors in that "structural defects in the constitution of the trial mechanism . . . defy analysis by harmless-error standards." *Id.* Such structural errors are a "very limited class of errors that trigger automatic reversal because they undermine the fairness of a criminal proceeding as a whole." *United States v. Davila*, 569 U.S. 597, 610 (2013) (internal quotation and citation omitted). "Errors of this kind include denial of counsel of choice, denial of self-representation, denial of a public trial, and failure to convey to a jury that guilt must be proved beyond a reasonable doubt." *Id.* (citing cases). By contrast, under *Brecht v. Abramson*, federal habeas petitioners 'are not entitled to habeas relief

30

based on trial error unless they can establish that it resulted in "actual prejudice.'", 507 U.S. 619, 637 (1993).[6]

Petitioner is correct that there is Sixth Circuit caselaw stating a *Batson* error is structural, and thus not subject to harmless error review. *See, e.g.*, *United States v. McFerron*, 163 F.3d 952, 956 (6th Cir. 1998) ("Accordingly, we find that harmless error analysis is not applicable to the district court's erroneous application of the three-step *Batson* test and the improper denial of McFerron's peremptory challenges."); *see also Sims v. Berghuis*, 494 F. Supp. 2d 575, 583 (E.D. Mich. 2007) (finding *Batson* error and then noting: "Furthermore, *Batson* errors are structural errors and not subject to harmless error analysis. . . . Therefore, the Court grants a conditional writ of habeas corpus on Petitioner's *Batson* claim.") (citing *McFerron*, 163 F.3d at 956).

The Supreme Court has not, however, explicitly held that a *Batson* error is structural and not subject to harmless error review. And habeas review is concerned with the "clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Further, in a recent case, the Supreme Court indicated that *Batson* claims could be subject to harmless error analysis. *See Davis v. Ayala*, 135 S. Ct. 2187 (2015). In *Davis*, the Supreme Court reviewed the Ninth Circuit Court of Appeals' decision to grant a writ of habeas corpus on the basis that the trial judge used an impermissible procedure for ruling on the petitioner's *Batson* challenges. *Id.* at 2202. In the underlying case, the trial judge permitted the prosecutor to provide *ex parte* race-neutral explanations in response to the defense counsel's *Batson* challenges. *Id.* at 2194. The trial court then concluded the prosecutor's explanations were credible and allowed the government to use "seven peremptories to strike all of the African-Americans and Hispanics who

_____

6. On direct review of federal constitutional trial errors, courts apply the "harmless beyond a reasonable doubt" standard of prejudice from *Chapman v. California*, 386 U.S. 18 (1967).

were available for service." *Id.* at 2193-94. Following the Ninth Circuit's grant of the petition, the Supreme Court reversed, holding that the appellate court failed to give enough deference to the state court's determination that the error in excluding counsel from the *Batson* step two process was harmless beyond a reasonable doubt under *Chapman*, insofar as the petitioner could not prove that he suffered actual prejudice. *Id.* at 2208. Specifically, the Court assumed for the sake of argument that Petitioner's rights were violated by the *ex parte* procedure, *id.* at 2197, but found the state court's harmlessness determination not an unreasonable application of clearly established federal law, *id.* at 2197-2208.

A district judge in the Southern District of New York recently confronted this same legal question – is it unreasonable for a state court to apply harmless error to a *Batson* error? – and concluded it was not. *See Carmichael v. Chappius*, 340 F. Supp. 3d 340 (S.D.N.Y. 2018).[7] It reasoned:

> This case is one in which fairminded jurists could disagree. Reasonable arguments exist in support of both positions: that *Batson* claims are structural errors for which prejudice is presumed, and, alternatively, that they are subject to harmless error review. In support of the former, one may argue that *Batson* claims are structural in nature, and that *Davis*, a case about presence of counsel, did not overrule Second Circuit precedent. On the other hand, one could argue — and would have a reasonable basis to do so — that *Davis* indicates that *Batson* challenges may be evaluated under harmless error, and therefore the state court did not err. Whether *Davis* conclusively determines that *Batson* challenges are structural errors, or subject to harmless error analysis, is immaterial. For present purposes, *Davis* is significant in that it provides a reasonable basis for the state court's analysis, leading this Court to the conclusion that the state court's determination was not objectively unreasonable. *See Harrington*, 562 U.S. at 101, 131 S.Ct. 770.
>
> The standard of review under AEDPA "is difficult to meet, [but] that is because it was meant to be." *Harrington*, 562 U.S. at 102, 131 S.Ct. 770. Given *Davis*, and the reasonable basis for disagreement, the decision of the state court to apply harmless error analysis and deny the *Batson* claim due to a lack of evidence that

---

7. This decision is currently pending on appeal before the Second Circuit Court of Appeals. *See Carmichael v. Chappius*, No. 18-3100 (2nd Cir. 2018).

the violation resulted in an unfair jury represented a reasonable application of controlling precedent.

*Id.* at 349. The undersigned agrees with this persuasive explanation and finds the state court's decision in the instant case to apply harmless error analysis to Petitioner's *Batson* claim not an unreasonable application of clearly established federal law.

Petitioner argues that Respondent "has cited no case that actually supports its insistence on the idea that the trial court's knee-jerk rejection of [Petitioner's] *Batson* challenge was proper." (Doc. 10, at 13). But the question is not whether it was proper, but whether the state court decision finding it to be harmless error was unreasonable under AEDPA. *See Davis*, 135 S. Ct. at 2199 ("When a *Chapman* decision is reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the harmlessness determination itself* was unreasonable.'") (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in *Fry*).

The undersigned further finds the state court's harmless error analysis itself not an unreasonable application of federal law. Petitioner has not demonstrated "actual prejudice" resulting from the trial judge's incorrect decision to interrupt the *Batson* analysis at step two. The state court's analysis – that Petitioner had not shown that the mis-step in procedure resulted in an unfair jury – is reasonable and supported by the record. As the state court found, the excused juror made several statements suggesting "she would have difficulty remaining fair and impartial." *Webster*, 2016 WL 1593052, at ¶72. Additionally, as the state court reasonably found, she "showed an inability to be objective and to keep an open mind." *Id.* at ¶74. Specifically, the court found the juror's "premature suspicion that evidence would be 'manipulated,' coupled with her opinion that the credibility of police officers should be judged according to a different standard than lay witnesses, indicated an unfair prejudice against the state." *Id.*; *see also* Tr. 322-24, 330-35, 37-71,

423-24, 467-68.[8] Given these readily-apparent race-neutral reasons in the record, the undersigned finds it was not an unreasonable application of federal law for the state court to find the *Batson* violation harmless beyond a reasonable doubt.

For these reasons, the undersigned recommends the Court find the state court's decision was not an unreasonable application of clearly established Federal law, and deny Ground Two on the merits.

---

8. Although not cited by the state court, further demonstrating that Petitioner cannot show actual prejudice from the trial court's misapplication of *Batson*, the undersigned notes that earlier in the *voir dire* proceeding, the prosecutor attempted to remove the juror at issue for cause, citing one of the race-neutral reasons later relied upon by the state appellate court:

> My concern with Juror No. 11 is that during her answering your questions and mine about whether she can put aside outside – not even outside influences but other concerns that aren't evidence, that being the victim's family, the defendant's family, et cetera, she said that she could not do that.
>
> And I think that's a problem.

(Tr. 515). The trial judge denied the prosecution's request to remove the juror for cause, while recognizing the basis for the prosecutor's reasoning:

> And No. 11, a lot of her answers were quirky. I am sure that's not the best way to phrase that, but just kind of a quirky individual as far as her responses.
>
> She did indicate potential difficulties with bias or prejudice. I shouldn't say bias or prejudice. With sympathy in this matter.
>
> But she did indicate that she could set that aside.
>
> So at this point I am not going to remove No. 11 for cause.

(Tr. 518-19).

Ground Three

In Ground Three, Petitioner asserts the state court violated his due process rights by failing to require the jury determine the issue of venue beyond a reasonable doubt. (Doc. 1, at 23-26). Respondent asserts this claim is non-cognizable. (Doc. 5, at 16-19). Petitioner does not respond to this argument. *See* Doc. 10, at 1 ("In this Traverse, Petitioner addresses only the Warden's argument opposing Ground Two.").

Petitioner's argument sounds in constitutional "sufficiency of the evidence". The well-settled standard of review for evaluating the merits of such constitutional claims was established by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). As the Supreme Court held in *Jackson*, because the Due Process Clause requires the State to prove beyond a reasonable doubt every fact necessary to constitute the charged offense, *In re Winship*, 397 U.S. 358, 363-64 (1970), "the relevant question" in assessing the sufficiency of the evidence "is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original). In applying this standard, the federal court is bound by the substantive elements of the criminal offense as defined by state law. *Id.* at 324 n.16; *Geboy v. Brigano*, 489 F.3d 752, 762 (6th Cir. 2007) (holding that the *Jackson* sufficiency of the evidence test applies only to the essential elements of crimes as defined by state law). Furthermore, a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005).

Petitioner argues that: 1) there was insufficient evidence of venue; and 2) the trial court erred in deciding the question of venue itself, rather than submitting it as a factual determination for the jury.

The state court rejected this claim based on state law:

{¶ 77} In the fourth assignment of error, Webster argues the trial court erred in finding and instructing the jury that venue had been conclusively established with respect to the offenses that occurred in Canton, which is located in Stark County.

{¶ 78} R.C. 2901.12 is Ohio's criminal venue statute. R.C. 2901.12(A) sets forth the general rule that a trial in a criminal case shall be held "in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." "The purpose of the venue requirement is to give the defendant the right to be tried in the vicinity of the alleged criminal activity, and to limit the state from indiscriminately seeking a favorable location for trial that might be an inconvenience or disadvantage to the defendant." *State v. Koval,* 12th Dist. Warren No. CA2005–06–083, 2006–Ohio–5377, ¶ 9, citing *State v. Rankin,* 12th Dist. Clinton No. CA2004–06–015, 2005–Ohio–6165, ¶ 11.

{¶ 79} Venue is not a material element of the offense charged. However, it is a fact that must be proved in criminal prosecutions unless it is waived by the defendant. *State v. Headley,* 6 Ohio St.3d 475, 477, 453 N.E.2d 716 (1983). "The standard of proof is beyond a reasonable doubt, although venue need not be proved in express terms so long as it is established by all the facts and circumstances in the case." *Id.*

{¶ 80} R.C. 2901.12(H) addresses venue where an offender commits offenses in multiple jurisdictions as part of a course of criminal conduct. That section provides, in relevant part:

> (H) When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred. Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
>
> * * *
>
> (2) The offenses were committed by the offender in the offender's same employment, or capacity, or relationship to another.
>
> (3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
>
> (4) The offenses were committed in furtherance of the same conspiracy.
>
> * * *

36

> (6) The offenses were committed along the offender's line of travel in this state, regardless of the offender's point of origin or destination.

The trial court has broad discretion to determine the facts that would establish venue. *State v. Jackson,* 141 Ohio St.3d 171, 23 N.E.3d 1023, 2014–Ohio–3707, 23 N.E.3d 1023, ¶ 144.

{¶ 81} In this case, there was evidence that members of the Heartless Felons regularly commit robberies and burglaries in order to finance their organization. There was also evidence that Webster was the head of the Stark County chapter of the organization. Indeed, Webster's cell phone records showed that he communicated with gang members regarding upcoming meetings while he was en route to and from Canton around the time of the robbery. Based on this evidence, the court reasonably concluded that Webster, as an agent of the gang, committed the Canton robbery as part of a course of criminal conduct committed for the purpose of funding the Heartless Felons. We find no abuse of discretion in the court's determination that venue was proper in Cuyahoga County. Therefore, we turn to the question of whether Webster waived his right to trial on the issue of venue.

{¶ 82} As previously stated, venue must be proven beyond a reasonable doubt even though it is not an element of any particular crime, unless it was waived. *Headley,* 6 Ohio St.3d 475 at 477, 453 N.E.2d 716. Webster contends the court deprived him of his right to a jury trial on the issue of venue. However, Webster waived his right to a jury on all gang-related counts and specifications and sought to exclude all evidence of Webster's gang affiliation because such evidence would be unfairly prejudicial. The state would have needed to introduce additional gang evidence in order for the state to prove that venue was proper. It is impossible for Webster to have it both ways. Thus, Webster waived his right to a jury trial on the issue of venue when he executed a jury waiver on all gang-related counts.

{¶ 83} Moreover, the weight of the evidence overwhelmingly supports the court's finding, beyond a reasonable doubt, that venue was proper. Therefore, Webster is unable to demonstrate how he was prejudiced by the court's decision to preclude the jury from deciding if venue was proper. We therefore find no error in the court's instruction to the jury that venue for the Stark County offenses was conclusively established.

{¶ 84} The fourth assignment of error is overruled.

*Webster*, 2016 WL 1593052, at *15-16.

It is not this Court's role to sit as an additional appellate court. *See, e.g.*, *Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988). Even more importantly, "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw*, 546 U.S. at 76. Further, state courts define the elements of state crimes, and what is essential to establish each element. *See, e.g.*, *Sanford v. Yukins*, 388 F.3d 855, 862 (6th Cir. 2002) ("What is essential to establish an element, like the question whether a given element is necessary, is a question of state law.") (quoting *Bates v. McCautry*, 934 F.2d 99, 103 (7th Cir. 1991)); *see also Vroman v. Brigano*, 346 F.3d 598, 604 (6th Cir. 2003) ("Federal courts are obligated to accept as valid a state court's interpretation of state law and rules of practice of that state.").

The state appellate court, interpreting state law, here determined: "Venue is not a material element of the offense charged." *Webster*, 2016 WL 1593052, at ¶ 79. This determination binds a federal court. *Bradshaw*, 546 U.S. at 76. Because venue is not an "essential element" of the crime, Petitioner cannot challenge, under federal law, the sufficiency of the evidence as to venue. *See, e.g.*, *Baisden v. Tate*, 1989 WL 16145, at *1 (6th Cir.) (unpublished table disposition) (rejecting a challenge to the trial court's jurisdiction on grounds of insufficient evidence of proper venue because it was "not cognizable in federal habeas corpus and was therefore properly dismissed because matters concerning venue involve matters of state law"); *Billman v. Warden*, 2016 WL 931262, at *7 (S.D. Ohio) ("Consequently, Petitioner simply has no federal constitutional right to proof that he committed the crimes in Monroe County."), *report and recommendation adopted*, 2016 WL 3365407; *Hendrix v. Lisath*, 2015 WL 413802, at *40 (N.D. Ohio) ("matters concerning venue involve matters of state law and therefore any such claim is likewise not cognizable on federal habeas review"); *Hackney v. Lafler*, 2008 WL 2544869, at *8 (E.D. Mich.) (finding that

petitioner's claim that the prosecution had failed to prove that a crime had occurred in two counties was not cognizable because the issue raised a question of state law).

Although Ohio law requires venue to be proven in criminal prosecutions, *see Webster*, 2016 WL 1593052, at ¶ 79 (citing *Headley*, 6 Ohio St. 3d at 477), this Court cannot offer relief for a violation of state law.[9] Moreover, even if Petitioner *did* have a due process right to proof of venue, the state court decision that Petitioner waived that right when he elected to have the gang-related charges tried to a jury is not contrary to or an unreasonable application of federal law. For these reasons, the undersigned recommends Ground Three be denied.

### CONCLUSION AND RECOMMENDATION

Following review, and for the reasons stated above, the Court recommends the Petition be denied.

s/James R. Knepp, II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).

---

9. And, although the Sixth Amendment provides that an accused has a right to jury trial in the "State and district wherein the crime shall have been committed," the U.S. Supreme Court has not found that this provision applies to the states. *Cook v. Morrill,* 783 F.2d 593, 595 (5th Cir. 1986). The Sixth Circuit and several other federal courts have found that it does not. *Id.* at 595; *Keeton v. Bradshaw*, 2006 WL 2612899, at *14 (N.D. Ohio) (citing, *inter alia*, *Caudill v. Scott*, 857 F.2d 344 (6th Cir. 1988) (per curiam)).